```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4    COOPER NOTIFICATION, INC.,        :    CIVIL ACTION
                                        :
 5                 Plaintiff,           :
                                        :
 6            v.                        :
                                        :
 7    TWITTER, INC, EVERBRIDGE, INC., :
      RAVE WIRELESS, INC., and          :
 8    FEDERAL SIGNAL CORP.,             :
                                        :
 9              Defendants.             :    NO. 09-865 (LPS)

10                              - - -

11                       Wilmington, Delaware
                       Thursday, December 15, 2011
12                       Telephone Conference

13                              - - -

14    BEFORE:        HONORABLE LEONARD P. STARK, U.S.D.C.J.

15                              - - -

16    APPEARANCES:

17
                 POTTER, ANDERSON & CORROON, LLP
18               BY:  PHILIP A. ROVNER, ESQ.

19                    and

20               KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                 BY:  PAUL ANDRE, ESQ.
21                    (Silicon Valley, California)

22                    Counsel for Cooper Notification, Inc.

23

24
                                 Brian P. Gaffigan
25                               Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3              ASHBY & GEDDES, P.A.
               BY:  ANDREW C. MAYO, ESQ.

4                     and

5              FENWICK & WEST, LLP
               BY:  RYAN J. MARTON, ESQ.
6                   (San Francisco, California)

7                        Counsel for Twitter, Inc.

8

9              YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  JAMES L. HIGGINS, ESQ.

10                    and

11             MERCHANT & GOULD, P.C.
               BY:  THOMAS J. LEACH, ESQ.
12                  (Minneapolis, Minnesota)

13                       Counsel on behalf of Federal Signal Corp.

14

15             RICHARDS LAYTON & FINGER, P.A.
               BY:  LAURA D. HATCHER, ESQ.

16                    and

17             BRACEWELL & GIULIANI, LLP
               BY:  EDWARD. A. CAVAZOS, ESQ., and
18                  CONOR M. CIVINS, ESQ.
                    (Austin, Texas)
19
                         Counsel for Everbridge, Inc.
20

21

22                       - oOo -

23                   P R O C E E D I N G S

24             (REPORTER'S NOTE:  The following telephone

25   conference was held in chambers, beginning at 10:53 a.m.)

1          THE COURT:  Good morning, counsel.  This is

2     Judge Stark.  Who is there, please?

3          MR. ROVNER:  Good morning, your Honor.  This is

4     Phil Rovner from Potter Anderson for the plaintiff; and with

5     me on the line is Paul Andre from Kramer Levin.

6          THE COURT:  Okay.

7          MS. HATCHER:  Good morning, your Honor.  Laura

8     Hatcher from Richard Layton & Finger.  With me on the line

9     are Ed Cavazos and Conor Civins from Bracewell & Giuliani

10     for Everbridge.

11          THE COURT:  Okay.  Anybody else there?

12          MR. HIGGINS:  Good morning, your Honor.  Jim

13     Higgins from Young Conaway on behalf of Federal Signal.

14     With me on the line is Tom Leach from Merchant & Gould.

15          THE COURT:  Okay.

16          MR. MAYO:  Good morning, your Honor.  Andrew

17     Mayo from Ashby & Geddes for Twitter; and with me on the

18     line is Ryan Marton from Fenwick & West.

19          THE COURT:  Okay.  Is that everybody?

20          Okay.  I take it that it is.

21          For the record, this is our case of Cooper

22     Notification Inc. versus Federal Signal Corp., our Civil

23     Action No. 09-865-LPS.  We're here to address discovery

24     disputes.  I have received a series of four letters.  I want

25     to begin first with Federal Signal's request for sanctions

1    from Cooper relating to purported improper preparation for

2    Rule 30(b)(6) depositions.  So let me hear first on this one

3    from Federal Signal, please.

4              MR. LEACH:  Thank you, your Honor.  This is Tom

5    Leach for Federal Signal.  We moved for sanctions based on

6    improper appropriation of 30(b)(6) witnesses and some of the

7    conduct within those depositions.

8              Cooper says that we weren't prejudiced at all

9    but because of their conduct, we had to fly back out to

10   New York to take another witness on a topic for which they

11   withdrew one of their witnesses from because he was

12   completely unprepared to testify on that topic.  And that

13   wasn't the only one.  There was a number of other topics for

14   which their witnesses simply weren't prepared for.

15             But I guess what was more egregious is the way

16   they prepared their witnesses.  These witnesses only met

17   with the attorneys, looked at a few documents that the

18   attorneys selected to show them, and the attorneys told

19   them how to testify about those documents.

20             They admit in their letter that both Mr. Hearn

21   and Mr. Milburn haven't been with the company long so they

22   didn't have much personal knowledge.  Neither Mr. Milburn,

23   nor Mr. Hearn spoke with any witnesses that had firsthand

24   knowledge of the facts to which they were going to testify

25   about.  Essentially, these witnesses heard the lawyers, the

1    litigation counsel's argument and parroted them back to us

2    in 30(b)(6) deposition testimony.

3            So we're seeking our fees for having to fly back

4    out to New York to take the deposition of Mr. Lowry on the

5    financial topic for which Mr. Hearn or, I am sorry, for

6    which Mr. Milburn was supposed to testify about and testify

7    that he was not prepared and for which Cooper withdrew him

8    as a 30(b)(6) witness.

9            We're also requesting the option, if we need to,

10   to take a 30(b)(6) witness on authentication and document

11   collection for which Mr. Hearn, I am sorry, Mr. Milburn was

12   also supposed to testify.  He was not prepared to testify

13   on that.  We had some back and forth.  At first, they said

14   that he completed that topic but later they agreed that

15   Mr. Drescher would provide testimony on that topic.

16           When we flew out to California, Mr. Drescher

17   was completely unprepared.  He admitted he was not prepared

18   to talk about any document collection in the case, and so we

19   seek the option to take that deposition if we needed in the

20   future as we get closer to trial.

21           The standard for preparing a 30(b)(6) deponent

22   is we are entitled to the information or knowledge of the

23   corporation, not merely what the attorney's argument is.

24   That is what we got in the case.  We got the attorney's

25   argument.  Both Mr. Hearn and Mr. Milburn simply listened

1    to what the attorneys had to say and that was to the extent

2    of their knowledge on almost all of the topics.

3              Now, Mr. Milburn was also supposed to cover

4    the topic of marketing.  He started at Cooper in January of

5    2010.  However, our category went from 2007 to the present

6    in terms of competition.  And he testified that he had no

7    knowledge and did nothing to prepare for that topic on

8    competition except for what he personally knew about that

9    topic, which means he knew nothing prior to January of 2010.

10             Cooper maintained that he completed that topic

11   and we would not get another witness.

12             Expert reports were due.  Those were submitted,

13   and we were prevented from taking any testimony on competition

14   before 2010.

15             Now, why is that important?  We had the right

16   to examine Cooper on the topic of competition for, for

17   example, our damages expert reports when they talk about the

18   hypothetical negotiation which their own damages expert says

19   would have taken place in 2008.  We simply had no witness

20   that was knowledgeable and he did nothing.  He talked to no one

21   of the attorneys and did nothing specifically on competition

22   to be able to testify on that topic.

23             Despite that, Cooper maintained that he has

24   completed that topic.

25             In terms of some of the statements that Cooper

1    makes in their letter, they say we had nine hours, for

2    example, for Mr. Milburn.  Those nine hours, they must be

3    counting all the breaks, which many of their breaks were

4    taken because their witness and the attorney wanted to take

5    and took long breaks during that deposition.  So it wasn't

6    nine hours of straight deposition testimony.  In fact, at

7    about seven hours, they cut us off despite us having more

8    questions.  And,

9              The reason I raise that is this has happened to

10   us a number of times.  We're all trying to work together

11   to burden Cooper as minimally as we can, so we all agreed to

12   take a witness.  There is three defendants in this case, all

13   with different systems, different theories, and we've been

14   basically forced to each figure out how to divide it amongst

15   the defendants.

16             So for Mr. Milburn, we certainly didn't get

17   nine hours.  They must be counting the breaks or maybe the

18   time that they were there but a lot of those breaks were

19   predicated on their witness wanting to take a break or the

20   attorney wanting to take a break.

21             I think we were entitled to get the corporation's

22   knowledge on these topics.  We are entitled to get witnesses

23   that spoke with the inventors, witnesses that spoke with the

24   financial people, or people that had information, firsthand

25   information about these topics.

1          What we got was the witness saying I looked at

2     some documents that the lawyer showed me and the lawyer told

3     me how to testify about them.  That is not a properly prepared

4     witness, and I question whether that is even appropriate in a

5     30(b)(6) deposition.

6          Counsel cannot filter through the evidence, set

7     aside what is bad for their case, and tell the witness only

8     what the good stuff is and let him testify to that without

9     no investigation or without any investigation or talking to

10    the people that actually know what happened.  And,

11         So for that reason, we would seek our fees and

12    costs for having to fly back out to New York to retake Lowry

13    on the topic of Cooper's finances.  We would also seek the

14    option to retake a witness on authentication and document

15    collection by Cooper, if we require it.

16         THE COURT:  All right.  Mr. Leach, although I

17    don't know if it is directly relevant to your request, there

18    is a suggestion in Cooper's letter that some of the question-

19    ing during the Milburn deposition was itself inappropriate or

20    unduly contentious.  Can you speak to that?

21         MR. LEACH:  Certainly.  I am not sure exactly

22    whose testimony they were citing.  Again, there was three

23    of us that were sharing the date.  But I don't think anyone

24    from the defendants were inappropriate.  We were simply

25    trying to get the facts, frustrated that the witness either

1   didn't know the facts or was simply trying to tell the

2   litigation or the outside counsel's argument of what the

3   facts were, but they had really no facts.

4          We went round and round trying to understand

5   what they knew, how they prepared, and in the end it became

6   clear.  I asked them very pointed questions at the end; and

7   one I cite in my brief is where I asked especially on the

8   contentious topic of this on-sale bar, the prior public use.

9          Basically, I asked Mr. Milburn:  Did they put

10  invoices, proposals in front of you, show you those documents

11  and tell you how to testify to them?

12         He unequivocally said yes.

13         So I don't think anyone at the deposition was rude

14  to Mr. Milburn or asked inappropriate questions, although we

15  were probing and trying to understand what he knew and what he

16  did to prepare.  And it was clear he didn't do anything but

17  talk with the lawyers.

18         THE COURT:  What is the date of the renoticed or

19  continuation of the Lowry deposition in New York, the cost

20  of which is the basis for your motion for sanctions?

21         MR. LEACH:  I don't know what date that actually

22  took place.  And when they say we weren't burdened, I was out

23  there for Federal Signal along with the other defendants to

24  take Milburn on the financial topic.  I was unable to take --

25  well, let me back up.

1          They said when they withdrew Milburn from a

2    bunch of topics, they said we'll make it as convenient as

3    possible.

4          Their proposal was to do David Drescher on some

5    of the topics in California on one day and Milburn or, I am

6    sorry, Lowry in New York the following day.  This would

7    have forced us to actually make sure different counsel did

8    it because you can't go to California, take a deposition,

9    and then get back to New York to take another deposition,

10   at least the same person can't without taking the "red eye"

11   back.  And so that was their first offer to us.

12         We obviously rejected that.  But in the end, I

13   had to send someone else.  So someone else at our firm had

14   to re-prepare for this deposition, fly to New York and take

15   it.  And,

16         I am looking at my calender now.  I can't -- I

17   don't see when that was.  Does anyone else --

18         THE COURT:  That's okay.

19         MR. LEACH:  -- in my co-defendants know when

20   that happened?  I thought it was November.

21         MR. CIVINS:  November 22nd, Tom.

22         MR. LEACH:  22nd.  Thank you, Conor.

23         THE COURT:  So the basis of my question is

24   really whether you or whoever took the deposition had reason

25   to be in New York at that time anyway?  And your answer is

1  no.

2                 MR. LEACH:  No.

3                 THE COURT:  Okay.

4                 MR. LEACH:  I don't think any of the defendants'

5  counsel had reason to be out there on that date.

6                 MR. CIVINS:  Everbridge did not.

7                 THE COURT:  Let me hear from Cooper, please.

8                 MR. ANDRE:  Your Honor, this is Paul Andre for

9  Cooper.

10                Just talking about Mr. Lowry's deposition, that

11  is not even noticed.  That is not even mentioned in Federal

12  Signal's letter.  So, obviously, that is not something they

13  were moving on the Court today.  They actually were framing

14  the issue of Mr. Milburn's deposition, whether it was a

15  waste of time or not.

16                That being said, three defendants in this

17  case each provided 30(b)(6) notices.  They did not try to

18  consolidate them.  There are over 100 topics.  Amongst

19  those three 30(b)(6) notices, many of them overlapped but

20  nevertheless there was over 100 topics.

21                We provided responses and objections to those

22  topics.  Many of them were overbroad and overly burdensome,

23  and we told them what we provided witnesses to testify to.

24                They did not have any response to our objections.

25  They accepted them and that includes those depositions to take

1     these witnesses.

2               They also noticed many 30(b)(1) witnesses, which

3     we're going to try to consolidate the 30(b)(6) deposition

4     into the 30(b)(1) just so it would be more convenient for to

5     all the parties and reduce the costs.  So we took our two

6     executives that had been noticed under 30(b)(1) and gave

7     them several of the topics under 30(b)(6) for each of the

8     defendants.

9               Their action of going to New York to take

10    Mr. Milburn and Mr. Hearn, they were there anyway.

11              The other 30(b)(6) topics that they noticed,

12    we did provide witnesses to testify on during the fact

13    discovery period and those witnesses testified completely on

14    those.

15              With respect to the one example Mr. Leach

16    raises in his argument today, the issue of competition.  We

17    didn't see the relevance of competition to the case, and we

18    objected on that ground.  We told them we would provide

19    someone to talk about competition in more recent times and

20    did so.  And at times, there were no other questions they

21    had pending about the competition, so for them to raise it

22    in a letter now I think is disingenuous.

23              More importantly, it talks about the prep of

24    the witnesses.  The fact of the matter is they're asking for

25    main topics that covered back to 2002 up through 2008 and

1   Cooper simply does not have employees that have personal

2   knowledge of that information.  We have former employees.

3              So as far as preparing witnesses to testify

4   about that, our current employees, we provided them with

5   dozens of documents they could read, deposition testimony of

6   the percipient witnesses, the 30(b)(1) witnesses that did

7   have personal knowledge, and they were prepared to testify

8   to the best they could be prepared.

9              Now, with Mr. Milburn, the questioning was

10  extremely contentious.  I would imagine if you asked Mr.

11  Milburn, he would consider it one of the worst days of his

12  life.  Counsel was on constant attack.

13             It did go over nine hours and 40 minutes, seven

14  hours of actual deposition testimony, as Mr. Leach talked

15  about.  It was a very long day and a very contentious day.

16  And Mr. Milburn, at some point, just forgot two of the topics.

17  He just could not remember, and he was being confused.

18             So we de-designated him on two of the topics and

19  had those covered by two other witnesses.  This is at no

20  additional cost to counsel.  It was not as if they flew out

21  to take Mr. Milburn's deposition for the sole purpose of

22  doing these nine or 11 topics on which defendant.  They

23  actually noticed the 30(b)(1) as well.

24             If anything, we did what we could to try to

25  consolidate and reduce costs by these defendants massive

1    30(b)(6) notice.  Our preparation of witnesses were as well

2    as we could do that with all the documents and evidence that

3    was available to us at the time.

4                THE COURT:  Mr. Andre, was there a topic that Mr.

5    Milburn was designated for that you ultimately de-designated

6    him and Mr. Lowry was the person who was designated eventually

7    on that topic?

8                MR. ANDRE:  Yes, your Honor.  It was on the

9    finances, which we don't believe was relevant.

10                They said they wanted to take finances.

11                We said we don't believe Cooper's finances are

12    relevant to this case, and we have had this issue many

13    times.  And,

14                They said they want to take a witness on that

15    topic.

16                We said, well, we have one person, our

17    controller, that can testify on the spreadsheets.  And,

18                What we did, we took the QuickBooks, and I

19    believe that is an issue that was raised in the other

20    letter, and we ran spreadsheets for them, detailed it all

21    ourselves.

22                The person that actually did that was Mr. Lowry.

23    We told them that would be the person that could testify to

24    it, if they wanted to do it.  We don't think it is relevant

25    whatsoever.

1          Two of the defendants choose to go.  I believe

2    Twitter even chose not to show up at that because they don't

3    believe it is relevant either, obviously.  So they close to

4    take Lowry.

5          We made him available out of pure cooperation

6    instead of objecting and having to come to your Honor for a

7    motion to compel.

8          THE COURT:  Is this Topic 28 on finance,

9    Mr. Andre?

10         MR. ANDRE:  That's correct.

11         THE COURT:  So isn't it the case then that

12   whether relevant or not, there is no protective order in

13   place?  You chose to designate Mr. Milburn.  He wasn't

14   prepared at the time of the deposition that counsel were

15   at to depose him on Topic 28, and then you redesignated

16   Mr. Lowry on Topic 28 and that necessitated counsel for

17   defendants to be in New York for the sole purpose of taking

18   Mr. Lowry's deposition on Topic No. 28.

19         Is that all correct?

20         MR. ANDRE:  I wouldn't characterize it that way,

21   your Honor.  I would say that the fact of the matter is we

22   are trying to consolidate as much as we could, but Mr.

23   Lowry -- if we are ever going to provide a detailed analysis

24   of Topic 28, which counsel required, it would be Mr. Lowry.

25         If they wanted to authenticate the documents,

1    those are the spreadsheets, Mr. Milburn could do so.  But

2    that was all he was willing to do, that is all he is going

3    to do.

4              They wanted to dig into the details of how those

5    documents, those numbers were created.  That is going to be

6    another witness.

7              THE COURT:  And on the authentication topic and

8    document collection, are you able to say at this point

9    whether there will be any challenges to the authenticity of

10   documents that you have produced?  Challenges from you?

11             MR. ANDRE:  No, your Honor.  There will be no

12   challenges on authentication of documents.

13             THE COURT:  Okay.

14             MR. ANDRE:  Mr. Milburn was the one who

15   authenticated those were the financial documents.  They say

16   what they say.  They are just spreadsheets.

17             But they want to know how the documents are

18   generated, and that is going to be another witness.

19             THE COURT:  All right.  Let me turn it back to

20   Mr. Leach.  Is there anything you wish to add?

21             MR. LEACH:  I do.  I would like to address

22   almost everything he said.  Let's start with the finances.

23             The topic is the unit sales, customer revenue,

24   cost of goods sold, profit, expenses for each of Cooper's

25   products, if any, that allegedly practice or embody the

1    claimed invention.

2            This topic is directly relevant to the

3    Georgia-Pacific factors of the hypothetical negotiation.

4    We were not solely seeking to authenticate documents.  We

5    wanted to understand what documents they had.  We wanted to

6    understand what these spreadsheets meant.  There are sales

7    numbers in these documents that we needed to understand and

8    someone was supposed to testify to that.

9            For him to say it wasn't relevant is simply not

10   the case.  Those documents are absolutely relevant or this

11   topic is absolutely relevant, and it necessitated us to go

12   to New York and get this information.

13           His point about there being 100 topics.  Many,

14   if not -- maybe there is three that don't overlap.  All of

15   these topics pretty much overlap.  The defendants tried to

16   consolidate and almost copy verbatim the topics and so there

17   weren't 100 topics that they had to deal with.

18           I think, your Honor, you correctly said that

19   they had a duty to move for a protective order.  They never

20   did that.  And,

21           Then on this point there is no one at Cooper

22   that has personal knowledge of these facts?  He is just

23   wrong about that.  Unless there has been a few witnesses

24   that have since left, I don't know but I think at the time

25   they were there.

1        I think Mr. Brabec works for Cooper.  He was one

2   of the inventors and one of the founders of Roam Secure, the

3   company way back when that dealt with a lot of this, a lot

4   these issues back then.  And,

5        The same with Dan Park.  He was also back then.

6   He still works at Cooper and he was one of the inventors

7   and founders of Roam Secure, the company that allegedly

8   developed the inventive technology.  And,

9        Also, they represent the other inventors and

10   founders of the company that are even third-party witnesses.

11   They certainly had access to these people.  They certainly

12   could have had Milburn or Hearn talk to them.  So I'll leave

13   it at that.

14        THE COURT:  All right.  Well, I am going to grant

15   the request for sanctions in connection with the deposition

16   which I am told was on November 22nd of Mr. Lowry.

17        Topic 28 sounds as if it is a relevant topic

18   but, more importantly, there was no protective order in

19   place to make it improper to question a 30(b)(6) witness on

20   Topic 28.  And,

21        In fact, Mr. Milburn was designated by Cooper to

22   testify as their 30(b)(6) witness on Topic 28.  He was not

23   prepared to do so.  He was de-designated, and then Mr. Lowry

24   was designated on that topic.  That necessitated defense

25   counsel to be in New York to depose Mr. Lowry on Topic 28

1    when they had no other reason to be in New York.  So I do

2    believe that sanctions are appropriate.

3                Now, mind you, I am not at this point ruling that

4    all defense counsel for all defendants will be reimbursed 100

5    percent of all of their costs associated with the November

6    22nd deposition.  I will make a specific determination as to

7    precisely how sanctionable this conduct is after I receive

8    further documentation.  And,

9                I will and do hereby direct the parties to meet

10   and confer and to propose to the Court by Monday a schedule

11   by which defense counsel will disclose precisely what it

12   is they are seeking in terms of a monetary sanction and to

13   provide a brief written argument in support of it and to

14   allow Cooper an opportunity to respond and defendants to

15   briefly reply to that.  After I have that full record, I'll

16   make a specific determination as to the amount of sanctions.

17               With respect to the option to take an additional

18   30(b)(6) deposition on authentication and document collection

19   issues, the request is granted to that as well.  The defendants

20   have that option and may take an additional 30(b)(6)

21   deposition on those topics.

22               Let's move then quickly on to the other two

23   letters.  Here, it is disputes raised by Everbridge against

24   Cooper.  So let me hear first briefly from Everbridge.

25               MR. COVAZOS:  Good morning, your Honor.  This is

1  Ed Cavazos for Everbridge.  I am going to address the first

2  issue raised in our letter.  Then any colleague, Conor

3  Civins will address the remainder.

4        I will do this very quickly because I know there

5  are several issues in our letter.

6        This first issue we think is a relatively

7  straightforward one, involves an e-mail that was produced

8  during the normal course of discovery by Cooper.  As your

9  Honor may see when you review the e-mail, the e-mail

10  makes it pretty apparent that Cooper personnel had some

11  communications with ex-Everbridge employees in which we

12  believe those Everbridge employees disclosed certain trade

13  secrets to Cooper.

14        Our request is very simple, your Honor.  That

15  is not as Cooper has argued it is, a de-designation, because

16  we believe these are trade secrets and we don't want this

17  document de-designated and losing protection under the

18  protective order but rather a very limited opportunity to

19  share with our client the first two pages of that document,

20  the ones that we attached to our letter brief, so that our

21  client understands the extent to which their trade secrets

22  may have been compromised, our client may take steps to

23  potentially mitigate further compromise of his trade secrets,

24  to perhaps identify which of its ex-employees are engaging

25  in the dissemination of their trade secrets.

1          We thought it was a pretty straightforward

2     request, your Honor.  If you look at the face of this letter,

3     we don't see anything in this letter other than facts and the

4     information regarded to our client and us.  We saw no basis

5     for any reason that Cooper would object to us showing this

6     letter for our clients so they could determine how best to

7     respond to it.

8          You will see in the correspondence leading up

9     to this, we even offered that Cooper, if there was something

10    they thought was somehow confidential to their client embodied

11    in this letter that we would be willing to consider what

12    that was, whether it needed to be redacted.  We didn't get

13    any such specificity from them.  Quite honestly, your Honor,

14    we're a little puzzled by our inability to show our client

15    this letter which purports to contain their trade secrets.

16         THE COURT:  Are you willing to represent as to

17    what you would or would not put this to or that your client

18    would?

19         MR. COVAZOS:  I don't think I am in a position

20    to represent that because I haven't been able to discuss the

21    specific contents of the letter with my client.  I mean I

22    think it would be inappropriate for me to limit my client's

23    reaction to this before they understand the severity to

24    which the dissemination of these trade secrets may have hurt

25    them.

1          THE COURT:  Let me hear Cooper's response,

2      please.

3          MR. ANDRE:  Your Honor, this is an e-mail,

4      internal e-mail of Cooper's businesspeople talking about

5      competitive analysis.  Two of Everbridge's former employees

6      were talking out of school, and they were recording what they

7      were saying.  The fact of the matter is that information also

8      talks about how they can also position themselves in the

9      market to make their business more competitive.

10         The reason we have a major problem with this is

11     because this e-mail is not relevant to anything in this case

12     and showing it to the executives, which they hinted they're

13     going to be filing a lawsuit against Cooper for somehow

14     misappropriation of their trade secrets, not because of

15     anything Cooper did, just because they actually overheard

16     their ex-employees talking.

17         Nonetheless, there is no basis for showing this

18     to management.  There is no need for it.  It is not relevant

19     to anything in this case.  It is after close of fact discovery,

20     and the only reason they are doing it for is for improper

21     purposes.

22         THE COURT:  What about the idea of redacting the

23     stuff that you say is competitive information of your own?

24     Of Cooper's?

25         MR. ANDRE:  The essence of the entire e-mail is

1    Cooper's internal process on how they're thinking about

2    competition.  It would be such a massive redaction that

3    there is no basis.  I mean I wouldn't know what we could

4    make available, publicly available other than the fact that

5    two of their employees are talking.  And I think management

6    already knows that because they reported on that.  So I

7    don't know how to go at that.

8              We looked at the e-mail itself.  We have looked

9    at the fact that it is just an interim e-mail.  All companies

10   do competitive analysis on each other.  And just because it

11   has information about Everbridge doesn't make it any less

12   confidential to Cooper.

13             THE COURT:  All right.  Mr. --

14             MR. COVAZOS:  Your Honor, if I may quickly

15   respond.

16             THE COURT:  Yes, go ahead.

17             MR. COVAZOS:  This is a one page letter, if your

18   Honor doesn't have it in front of you.  This is not an

19   onerous and technical document that would have to be parsed

20   through.

21             I would represent to the Court that we don't

22   believe in good faith anything on this one page reflects any

23   Cooper anything.  It is all how much revenue the ex-employees

24   say we have, what type of customers we go after, et cetera.

25   It doesn't say here is how that compares to Cooper's

1    strategies or anything of the sort.

2              Your Honor, the bottom line is that unlike what

3    Mr. Andre tries to say this is, which is a report about

4    overhearing, it very clearly is directly competitive

5    proprietary type information and to the extent there is

6    anything about Cooper in here, there is the last part, the

7    very short last sentence of the letter where they basically

8    say let's go -- let's take this information and go out and

9    target Everbridge's customers with this.

10             This isn't proprietary or secret information

11   to them.  It is not competitive information of them.  It is

12   very clearly Everbridge trade secret information.  And by

13   the way, as we all know, it is not a defense to say I just

14   listened to people talk about trade secrets and then was

15   free to use them.  This is something my client has a right

16   to see.

17             In essence, your Honor, if we're not able to

18   show this to our client, Cooper has effectively laundered

19   this document by producing in this case, marking it as

20   attorneys' eyes only, and now I am not able to advise my

21   client on what, if anything, they might need to do or how

22   they may have been harmed by what went on here.

23             Final thought, your Honor.  It very clearly was

24   raised in a timely way.  Our protective order speaks to when

25   you are supposed to raise it.  It says during the

1    litigation.  It doesn't say anything about whether or not it

2    is during fact discovery.  And, in fact, our first request

3    was during the fact discovery.  I think that is a red

4    herring.

5            We think this is straightforward, your Honor.  Our

6    client deserves to see what its ex-employees is conveying to

7    its competitors in the market.  This is an improper attempt to

8    use a designation of a document to keep our client from doing

9    that.

10           THE COURT:  All right.  On this request; and for

11   the record, I have reviewed two page e-mail, it is Exhibit A

12   to DI 342; I am granting Everbridge's request for the limited

13   de-designation solely for the purpose of sharing this two page

14   e-mail with its management.

15           Having reviewed it, it does consist of information

16   that is information of Everbridge and not of Cooper.  To the

17   extent Cooper thought that it may have added some of its own

18   competitive information to it, it had the opportunity to

19   redact that, did not believe it was appropriate or could be

20   done.

21           I understand that argument, but on the whole, I

22   think the information is overwhelmingly, if not exclusively,

23   Everbridge's; and I will permit them, and hereby do permit

24   them, to share it with management as they request.

25           That doesn't, by any means, indicate that

1    anybody, including Cooper, is in violation or has some

2    liability for trade secrets or anything.  This is simply a

3    decision that Everbridge is entitled to see this document.

4            There are some remaining disputes.  We only have

5    a couple minutes.  I'll turn it over to, I think it was Mr.

6    Civins.  If you would, start first with the argument that

7    the Court has already ruled on all of these requests and

8    denied them previously.

9            MR. CIVINS:  Certainly, your Honor.

10           So all of the requests -- I'll start quickly

11   with the documents relating to the acquisition of Roam

12   Secure by Cooper.

13           Your Honor, we have been asking for these

14   documents for months.  We had a hearing on documents like

15   this.  The defendants were certain that there were documents

16   that hadn't been produced based on the limited production we

17   had gotten; and Mr. Andre made broad blanket statements that

18   all nonprivileged documents have been produced.

19           Frankly, your Honor, these statements have been

20   made throughout the litigation and these hearings and have

21   been proven time and time again not to be accurate.

22           We have testimony from David Drescher who was a

23   30(b)(6) witness specifically identifying documents, and

24   internal presentation prepared by Ken DeMarco, a pitch deck

25   that was meant for Cooper, prepared by Roam Secure.

1          Potentially, and I will acknowledge that this

2    one only potentially exists, David Drescher said he did an

3    analysis on his computer that did exist, and then he left

4    his computer with Cooper working lab and there was a due

5    diligence checklist that included a package of Roam Secure

6    documents, contracts, sale forecasts, financial statements,

7    and product over views.

8          This came up during the deposition.  I addressed

9    it with Mr. Andre on the record; and, you know, he vaguely

10   responded, well, we produced all non-privileged documents.

11         I said look.  And,

12         He said I don't know if these documents exist or

13   not.

14         The witness was clearly testifying not that he

15   thought these documents existed but that they did exist and

16   he recalled them.  And,

17         I said, well, we need these documents.  And,

18         Mr. Andre wasn't able to tell me whether they've

19   privileged or had been withheld or whether they were

20   withholding them.  Either they hadn't looked for them or

21   they were not clear on what their position was.

22         Again, your Honor, these documents are highly

23   relevant to our damages case and they should have been

24   produced.  All that was produced was the stock purchase

25   agreement and the attachment.

1          There is underlying analysis and preparation and

2     due diligence that went back and forth.  It could not have

3     been privileged between Cooper and Roam Secure, and none of

4     those have been produced.  And from Dave Drescher, we got

5     specific testimony about what those documents were.

6          THE COURT:  All right.  Let me stop you there,

7     Mr. Civins.

8          Mr. Andre, you have represented as recently

9     as your letter that you have produced all responsive

10    nonprivileged documents.  How can that be in light of what

11    Mr. Drescher testified?

12         MR. ANDRE:  Your Honor, Mr. Drescher was

13    testifying about the acquisition at the time period well

14    before the patent issued.  So the documents after the

15    patent issued or after we began this lawsuit or even in

16    this lawsuit, we produced all documents that we were able to

17    locate.  We did diligent searches throughout the entire

18    company, including the legal department, to find all

19    documents relating to the acquisition.

20         THE COURT:  So you have not produced documents if

21    they were responsive but prepared prior to your contemplation

22    of the lawsuit?

23         MR. ANDRE:  No.  No, your Honor.  We produced

24    all documents.  My point about that is Mr. Drescher is

25    talking about there are certain documents that existed

1    before the patent issued, during the acquisition.  Whether

2    they did or did not, I don't know.  As I told counsel, all

3    I know now, if they existed at the time of the lawsuit, we

4    produced them.  Every document we had in our possession.  And,

5         I think Mr. Civins is incorrect.  The documents

6    he testified to, we did produce in this case that Mr. Drescher

7    talked about.  He talks about a slide deck.  He didn't know

8    if it is available or not, exists or not.  He talks about a

9    due diligence checklist.  There is no due diligence

10   checklist.  We looked everywhere.

11        THE COURT:  Okay.  Sorry to interrupt you.  I am

12   just running out of time.  But you continue to maintain you

13   produced all of the nonprivileged responsive documents and

14   you have diligently searched; correct?

15        MR. ANDRE:  That's correct, your Honor.

16        THE COURT:  All right.  Mr. Civins, I understand

17   your skepticism but I don't know what I can do for you if

18   they say they searched and can't find them.

19        MR. CIVINS:  Certainly, your Honor.  I know you

20   are running out of time so I will move on.

21        I will say that you said you understand our

22   skepticism.  This is an increasing problem in this litigation

23   and so we continue to come to these hearings and we get this

24   sort of representation and then we get testimony these

25   documents exist.

1    Let me move on.  I am going to move on to the last document

2    that we talked about here.  I am sorry.  Let me move on to --

3    let's see here -- Point No. 5.

4              So there were financial documents that during

5    the deposition of Mr. Lowry, there was a spreadsheet that we

6    have attached to our letter as an exhibit, and he testified

7    about two main things.  One is that he had reviewed Roam

8    Secure financial statements in order to prepare the summary

9    that was on the first page of that document.

10             I went around and around with him asking him

11   to identify those documents.  After we got long speaking

12   objections from opposing counsel, he clammed up and said he

13   couldn't remember but he did know he reviewed documents a

14   few months before to prepare that summary.  And I said,

15   well, we want those documents.

16             Those documents clearly exist because he used

17   them to prepare the spreadsheet, and all I want is the Roam

18   Secure financial documents he relied on to prepare the

19   summary, which is Bates number -- I'll get it for you here

20   in a second.  It is Bates number CNI018797.

21             Again, there is clear testimony under oath that

22   he reviewed Roam Secure financial documents to prepare that

23   document, and we don't have them.

24             The other issue that I wanted to raise that Mr.

25   Lowry testified about was the QuickBooks, the spreadsheet

1    that starts on CNI018798.

2          Now, I won't burden your Honor with the long

3    history of the on-sale bar issue, but this has become an

4    incredibly hotly contested issue in this case.  The more

5    we dig and the more documents that are produced, the more

6    evidence comes to light that this product was on sale before

7    the critical date.

8          We have an ECMA invoice dated March 15th.  We

9    have an e-mail suggesting that on March 15th.  We have

10   strange testimony from Mr. Tiene suggesting he backdated

11   that invoice.

12         Then, if you recall, your Honor, we asked you to

13   compel the metadata.  They produced the metadata.  We were

14   frankly thrilled with that production because it clearly

15   indicates that that document was in fact produced on

16   March 15th.

17         We have handwritten notes suggesting, you know,

18   over and over and over again.

19         Now, the RSAN spreadsheet that Mr. Lowry

20   testified about was run from QuickBooks and goes back from

21   2000 to present, and some of it is SAP information but the

22   information we are interested in is from QuickBooks and it

23   is an order intake report, which I have never seen that

24   report produced.  And I am sure your Honor is familiar with

25   it.

1          QuickBooks had a myriad of information that

2    Cooper is sitting on that they have chosen not to produce.

3    They have cherry-picked the exact report they wanted to

4    produce which is an order intake report.  It doesn't

5    address -- and their letter is inaccurate.  It doesn't

6    address financial revenue, it doesn't address sales, it

7    doesn't address accounts receivable.

8          There is a QuickBooks report and information

9    that goes back to 2000 that shows more information about

10   RSAN sales that they have produced.  What I would ask, your

11   Honor, they're obligated to run the various reports that

12   are available relating to that RSAN information, and that is

13   what we want.  Because I strongly suspect that when you run

14   other reports, other dates are going to appear that support

15   our case, that support our theory that this product was on

16   sale in March.  And,

17          To be clear about it, your Honor, the order

18   intake report, Mr. Lowry couldn't testify specifically about

19   what that even was, but the order intake report has to do

20   with when an order was received, and it is not clear at all

21   what it is that means an order was received.  Sometimes it

22   means a purchase order is actually sent from -- a purchase

23   request is sent from the client or whatever.  But accounts

24   receivable stuff is sometimes lodged before that.  Revenue

25   information is logged before that.

1             There is information Cooper is sitting on in

2       that QuickBooks system that we are entitled to relating to

3       RSAN sales, and that is one of the things that we're

4       seeking.

5             THE COURT:  All right.  I have to cut you off

6       there.  Let me give Mr. Andre a couple minutes to respond,

7       if he wishes.

8             MR. ANDRE:  Your Honor, I don't know where to

9       go with that, to be quite frank.  We produce all our sales

10      documents.  We haven't held anything back.  They say we're

11      sitting on things.  For example, we produced a March 15th

12      invoice.  If we were going to hold anything back, that would

13      be one we would hold back.  Obviously, it was postdated or

14      backdated.

15            As far as Mr. Lowry's testimony, it is something

16      that they took a full day deposition in New York as well as

17      the scope of the 30(b)(6) topics, obviously, but nonetheless

18      he did talk about how the reports were generated.  He gave

19      summaries that your Honor already ruled on those were

20      sufficient.

21            They seem to be looking for the needle in the

22      haystack.  We've run many different summaries using the

23      Quickbooks analysis or the type of analysis that Mr. Lowry

24      runs.  He provides all the information we think we needed to

25      provide.  Your Honor already ruled we have provided.  So I

1    am not sure exactly what they're looking for.  They

2    keep thinking there is buried information.  There just is

3    nothing else out there.

4            I don't know how to run the different reports

5    they're talking about because we have run every report we

6    can think of.

7            MR. CIVINS:  Your Honor, may I briefly respond?

8            THE COURT:  Mr. Andre, if they tell you what

9    additional reports they want you to run, what would the

10   reason not to run them?

11           MR. ANDRE:  Your Honor, we have; no problem

12   running additional reports.  It is just they keep making up,

13   you know, every time we run one report, they want another

14   one run until we produce another.

15           We produced several reports here.  It gets to

16   the point where it is getting to be burdensome.  We will

17   run additional reports if they are very specific as to what

18   they're looking for and if we have that capability.  Because

19   some of the things they're asking for, we don't have that

20   capability to do so.  If we have the capability, we'll do

21   so.  We told them that on multiple occasions.

22           THE COURT:  Mr. Andre, I didn't give Mr. Civins a

23   chance to respond to that, but I am inclined to let them do

24   forensic metadata as it appears the metadata seems consistent

25   with what they thought it would show, but tell me what your

1   reason is for why they should not be permitted to do forensic

2   analysis?

3               MR. ANDRE:  Your Honor, the metadata that was

4   produced and that is available to them, we produced six

5   pages of metadata to them.  It either shows or doesn't show

6   what they think it does.  And why they want to get forensic

7   analysis of it is beyond me other than the fact they are

8   trying to make something fit that doesn't fit.

9               I don't believe the metadata shows what they

10  think it shows.  In fact, it shows just the opposite.  It

11  shows that the document had nine versions of it, and the

12  last version, which is the document that was produced as it

13  was backdated was actually dated exactly as Mr. Tiene says

14  it was.

15              So they're trying to monkey around with metadata

16  and say what it doesn't say and there is no basis for doing

17  so.  They have the actual metadata itself.  It says what it

18  says, and there is no basis for doing any type of forensic

19  analysis on that.

20              THE COURT:  Mr. Civins, real quick.  Is there

21  anything you want to add?

22              MR. CIVINS:  Your Honor, absolutely.  We're not

23  going to monkey around with metadata.  What they produced is

24  not metadata.  They are screen shots of metadata.  Metadata

25  by definition is native information, and that is what they

1    were ordered to produce and they did not do it.

2              Herein lies the problem, your Honor.  You know,

3    Mr. Andre has concocted an argument suggesting there are

4    nine different versions, and we got again stretched

5    testimony from Mr. Drescher suggesting that, well, this

6    looks -- I mean, again, the testimony on this particular

7    issue has just gone on and on and on and shifts constantly,

8    and he testified under oath that, well, it looks corrupt to

9    him.  I mean with no basis whatsoever.

10              So, one, they didn't produce the metadata, they

11    produced screen shots.  Two, at the very least, given what

12    they're going to argue, I think we're entitled to hire a

13    forensic expert to go in and look at the stuff.  As an

14    Officer of the Court, we're not going to "monkey" with

15    anything to make it say something it doesn't want to say --

16    that it doesn't say.  We simply want a chance to examine

17    its meaning.

18              THE COURT:  All right.  I need to cut you off

19    there.

20              On these what I consider to be three requests, I

21    am granting all three of them.

22              First, on the metadata, I do think that given

23    the importance of the issue relating to on-sale bar, and

24    given that the screen shots produced so far at least super-

25    ficially appear to support the defense that we ought to get

1    to the bottom of this, and if defense wants to incur the

2    expense of undertaking a forensic analysis of the actual

3    metadata, provided that they take all necessary steps to

4    make sure that they don't do anything to transform the

5    metadata, and I am confident the parties can work out a

6    mechanism for ensuring that that does not occur; again, if

7    the defense wants to take on that analysis, they may do so.

8              The spreadsheets, Mr. Andre has agreed that

9    within reason Cooper will agree to run some additional

10   reports from QuickBooks, so defendants are to identify for

11   Cooper what additional reports they want and you should do

12   so in a very timely manner.  And,

13             Finally, the documents that the witness, I

14   believe it was Mr. Lowry, testified he relied on to prepare

15   the summary, I am persuaded that those ought to be produced

16   at this point to defendants as well.

17             I'm sorry.  That is all the time I have for you

18   today.  The transcript will serve as my order and my rulings,

19   and thank you all for your time.  Good-bye.

20             (Telephone conference ends at 11:40 a.m.)

21

22        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                        /s/ Brian P. Gaffigan
                         Official Court Reporter
25                        U.S. District Court