1

```
01:43:12  1              IN THE UNITED STATES DISTRICT COURT

          2              IN AND FOR THE DISTRICT OF DELAWARE

          3                          - - -
             COOPER NOTIFICATION, INC.,        CIVIL ACTION
          4                                :
                      Plaintiff,           :
          5                                :
                         v.                :
          6                                :
             TWITTER, INC, EVERBRIDGE, INC., :
          7  and FEDERAL SIGNAL CORP.,     :
                                           :
          8          Defendants.            NO. 09-865 (LPS)
                                 - - -
          9
                              Wilmington, Delaware
         10               Thursday, February 23, 2012
                            Oral Argument Hearing
         11
                                     - - -
         12
             BEFORE:    HONORABLE LEONARD P. STARK, U.S.D.C.J.
         13
             APPEARANCES:           - - -
         14

         15          POTTER, ANDERSON & CORROON, LLP
                     BY:  PHILIP A. ROVNER, ESQ., and
         16               JONATHAN A. CHOA, ESQ.

         17               Counsel for Cooper Notification, Inc.

         18
                     ASHBY & GEDDES, P.A.
         19          BY:  JOHN G. DAY, ESQ.

         20              and

         21          FENWICK & WEST, LLP
                     BY:  RYAN J. MARTON, ESQ.
         22              (San Francisco, California)

         23               Counsel for Twitter, Inc.

         24
                                      Brian P. Gaffigan
         25                           Registered Merit Reporter
```

2

1  APPEARANCES: (Continued)
2
3           YOUNG CONAWAY STARGATT & TAYLOR, LLP
            BY: JAMES L. HIGGINS, ESQ.
4
                  Counsel on behalf of Federal Signal Corp.
5
            RICHARDS LAYTON & FINGER, P.A.
6           BY: FREDERICK COTTRELL, III, ESQ.
7                 Counsel for Everbridge, Inc.
8
9
10                      - oOo -
11                  P R O C E E D I N G S
12      (REPORTER'S NOTE: The following oral argument
13  hearing was held in open court, beginning at 1:58 p.m.)
14      THE COURT: Good afternoon.
15      (The attorneys respond, "Good afternoon, your
16  Honor.")
17      THE COURT: Let's begin by having you put your
18  appearances on the record for me.
19      MR. ROVNER: Your Honor, for the plaintiff,
20  Cooper Notification, Phil Rovner and Jonathan Choa from
21  Potter Anderson.
22      THE COURT: Welcome.
23      MR. ROVNER: Thank you, your Honor, for moving
24  the hearing up a bit. That was a conflict of mine and I
25  appreciate it.

3

1       THE COURT: It was no problem.
2       MR. DAY: Good afternoon, your Honor.
3       THE COURT: Good afternoon.
4       MR. DAY: On behalf of defendant Twitter, John
5  Day from Ashby & Geddes. With me and presenting argument
6  for Twitter today, Ryan Marton from Fenwick & West.
7       THE COURT: Thank you, your Honor.
8       MR. COTTRELL: Good afternoon, your Honor.
9       THE COURT: Good afternoon.
10      MR. COTTRELL: Fred Cottrell for defendant
11  Everbridge.
12      THE COURT: Thank you.
13      MR. HIGGINS: Good afternoon, your Honor. Jim
14  Higgins for Federal Signal.
15      THE COURT: Okay. Great.
16      Well, we are here on two motions both filed by
17  Twitter and Mr. Marton, you are the one that I going to
18  argue that; is that correct?
19      MR. MARTON: That is correct.
20      THE COURT: Well, we'll hear from you first. Go
21  ahead and argue both of them, then we'll let plaintiff
22  respond.
23      MR. MARTON: Okay. I'll start with the motion
24  to dismiss that implicates my codefendants as well. I think
25  we might be able to dispose of it fairly quickly.

4

1       Basically, as the documents that we've submitted
2  with our papers readily reflect, it appears that Cooper agrees
3  with this but it is not certain, Cooper has dismissed claims
4  1 through 11 of the '428 patent with prejudice. They have
5  agreed with the defendants outside of court and not with any
6  document filed with his court that this has in fact happened,
7  but in their filings, the letter brief they filed while claim
8  construction was pending, I think it is Docket 331, they
9  stated they're not asserting these claims and in their
10 opposition to our instant motion they're saying we're not
11 asserting these claims. They don't actually recognize that
12 they have agreed to dismiss with prejudice these claims.
13      If we can get them to state on the record today
14 that in fact all parties have agreed that claims 1 through
15 11 of the '428 patent have been dismissed with prejudice,
16 then I think defendants can withdraw their motion.
17      THE COURT: Have you discussed that with
18 Mr. Rovner?
19      MR. MARTON: I haven't.
20      THE COURT: You have or have not?
21      MR. MARTON: Have not.
22      THE COURT: Mr. Rovner, are you going to be
23 prepared to say that?
24      MR. ROVNER: No, your Honor. If I had been
25 prepared to say that, we wouldn't be here today on it. We

5

1  wouldn't have filed opposition papers.
2       THE COURT: Then let's hear whatever argument
3  you wish to make.
4       MR. MARTON: Sure. Sure.
5       So after the close of discovery in this case,
6  five days before opening expert reports were due, counsel
7  for Cooper sent me an e-mail stating that they're withdrawing
8  claims 1 through 11. I responded shortly thereafter saying
9  are you dismissing these claims with prejudice?
10      The response from Paul Andre for Cooper was yes,
11 '428 patent, claims 1 through 11 with prejudice.
12      I asked subsequently, can we enter a stipulation
13 to this effect?
14      Paul Andre said yes. He provided a stipulation.
15      We made nonsubstantive edits to that stipulation
16 and sent it back. Cooper's counsel went silent. We repeat-
17 edly asked, can we get this thing on file? Can we get this
18 thing on file? Ultimately he said no, we're not going to
19 file it. We see no reason to file something with the court.
20 We'll just leave the stipulation as is.
21      Though he did not expressly say we're going to
22 agree to the stipulation at that point, to the form of that
23 stipulation, he acted as though the claims had in fact been
24 dismissed with prejudice, moving forward in the case.
25      At this point, what we're looking for is some

6

1  affirmation either from Cooper or the Court that this
2  stipulation has been entered.
3      THE COURT:  Let me ask you, because it is
4  formally here as a motion to dismiss.
5      MR. MARTON:  Sure.
6      THE COURT:  Are you moving to dismiss for lack
7  of subject matter jurisdiction or are you saying there is a
8  case in controversy?  What is it exactly that you are asking
9  me to do?
10     MR. MARTON:  It depends on Cooper's position
11 which is not yet clear to me.  If their statement is that
12 these claims are now just unasserted but not with prejudice,
13 so they're unasserted but they retain the right to assert
14 them later, then there is a case or controversy, and we're
15 asking for a motion to dismiss under 41(b), Rule 41(b),
16 which is failure to prosecute.
17     If there is an agreement that they have
18 dismissed these claims 1 through 11 with prejudice, then
19 we'll agree that there is no subject matter jurisdiction,
20 and it would be under 12(b)(1).
21     THE COURT:  All right.  So there is 41(b).  I
22 suppose, alternatively, I could direct you to file a motion
23 for summary judgment.
24     MR. MARTON:  That could work as well.
25     THE COURT:  Because they're not going to be able

7

1  to show me evidence in the record to support a claim of
2  infringement on claims 1 through 11; correct?
3      MR. MARTON:  That could work as well.
4      THE COURT:  As of today, though, or as of this
5  moment, it appears 1 through 11 are in the case and not
6  just there for infringement purposes but you moved for or
7  defended yourself contending that they are invalid; correct?
8      MR. MARTON:  That is true.  They are part of the
9  plaintiff's infringement contentions.  They were not part
10 of the plaintiff's expert report regarding infringement.
11     THE COURT:  But are they part of your effort to
12 invalidate the patent?
13     MR. MARTON:  They are not part of our invalidity
14 expert report.  They are part of our invalidity contentions.
15     THE COURT:  They were going to be part of your
16 expert report.
17     MR. MARTON:  Absolutely, and we did not include
18 them based upon the representations from Cooper's counsel.
19 The day before our invalidity expert report was due, I
20 received a stipulation from Paul Andre that was substantively
21 satisfactory.  I made minor non-subsequent edits to it and
22 sent it back.
23     THE COURT:  You submitted to me I think it is
24 called *Streck*, the recent case from the Federal Circuit.
25     MR. MARTON:  Yes.

8

1      THE COURT:  And I appreciate that you didn't
2  draw it into the argument, that was complying with the
3  rules, but here we are now.  Tell me if you think this case
4  helps you.
5      MR. MARTON:  It doesn't.
6      THE COURT:  Okay.
7      MR. MARTON:  We did not submit that because it
8  helps us.  We submitted it because it is recent case law on
9  an issue that we know the plaintiff intends to argue.
10     *Streck* and the other case that plaintiffs rely
11 on, the *Hoffman* case from New Jersey, about the lack of
12 jurisdiction over unasserted claims, are not applicable here
13 for the reasons we've already discussed but, in particular,
14 in *Streck* and in *Hoffman*, there was a general complaint of
15 you infringe a particular patent and then the first round
16 of infringement contentions specifically did not include
17 the claims that the Court determined it did not have
18 jurisdiction over.
19     In our case, we litigated this whole case all
20 the way up to expert reports as though those claims were in
21 the case.  We're talking through discovery, through claim
22 construction.  It is a very different scenario.  They're not
23 unasserted claims.
24     THE COURT:  Is there anything you want to add
25 before you go on to the other motion?

9

1      MR. MARTON:  No.  Actually, I think that's it.
2      THE COURT:  Let's talk about your other motion
3  then now.
4      MR. MARTON:  Okay.  This is Twitter's motion
5  for leave to amend its answering counterclaim to add in
6  substance an inequitable conduct allegation that's based on
7  Cooper's failure to disclose the fact that two commercial
8  embodiments of the patent were on sale and in use more than
9  a year prior to the critical date, which is April, actually
10 April 2002.
11     The touchstone for this motion, as the Court
12 knows and I think the plaintiffs have acknowledged, is
13 whether or not there is prejudice.  There is no identifiable
14 prejudice by this late amendment.  We acknowledge that it is
15 a late amendment, but Cooper has had full discovery on this
16 on-sale bar.
17     THE COURT:  Is your counterclaim and associated
18 affirmative defenses, is it absolutely identical with what
19 your codefendants have pled?
20     MR. MARTON:  Yes.  The pleading is a little bit
21 different but the substance is identical.
22     THE COURT:  If I allow it into the case, it is
23 not going to expand anything, it is going to be the same
24 claim that is already here twice already?
25     MR. MARTON:  It will be the exact same claim.

10

1   It has been explained in our expert reports. It has been
2   the subject of numerous depositions.
3         THE COURT: Did the defendants put in separate
4   experts on inequitable conduct?
5         MR. MARTON: No.
6         THE COURT: You can go on.
7         MR. MARTON: I mean as a practical matter, if
8   this motion is denied and all the defendants stay in the
9   case, the jury trial will be the same or the trial will be
10  the same on inequitable conduct, and it will have the same
11  impact.
12        Our concern is if, for whatever reason, the other
13  defendants fall out of the case, we want to also be able to
14  proceed with this defense. And the reason -- I should address
15  this. The reason we delayed in pleading this is it is pretty
16  clear from *Therasense*, from -- there was a case here, *Enzo*
17  *Life Sciences v Digene* that was before Farnan, also a case
18  *Advanced Cardiovascular v Medtronic* in the Northern District
19  of California, all cited in our papers, that make clear that
20  when you are pleading inequitable conduct, because of 9(b),
21  it is prudent, if not advised, that you wait until you have
22  conducted a fair amount of discovery to make sure you actually
23  have a legitimate claim. That is what we did.
24        With respect to the sale of REACT, we waited
25  until we got to depose the inventors to find out about that

11

1   sale.
2         With respect to the sale of RoaMail, the issue
3   was whether RoaMail practiced the invention. We waited
4   until we got the code for that product before we pled it.
5   That's all we did.
6         THE COURT: I thought the argument was you
7   waited only until after you deposed this Mr. Freudberg.
8         MR. MARTON: Well, Freudberg was a third party,
9   actually. He was the first witness we deposed and we
10  realized from deposing him that there had been an offer for
11  sale to the counsel of government but subsequently in the
12  coming weeks, we also deposed the inventors. We did most of
13  the depositions in August -- Well, Freudberg was in July.
14  Most of the depositions were in August and September.
15        THE COURT: There is an argument that you have
16  not adequately pled intent and, therefore, your proposed
17  amendment is futile. What do you say to that?
18        MR. MARTON: So as we all know, intent can be
19  pled generally. And I understand that our obligation is to
20  plead facts from which an inference of intent can be gleaned
21  and I believe we have done that.
22        This is a quintessential case of inequitable
23  conduct. It is not third party prior art that wasn't disclosed
24  to the Patent Office. These are commercial embodiments that
25  were sold, they were part of a sales blitz for two years

12

1   prior to filing for a patent application.
2         Filing the patent application was an
3   afterthought; and the fact that the inventors who were all
4   involved in the sales of these products, who then prosecuted
5   this patent did not disclose existence of these commercial
6   embodiments and the fact that they were on sale and in use,
7   the only reasonable inference is that they intended to
8   deceive the PTO. We plead those facts. We think that you
9   can infer deceptive intent, and we think our pleading is
10  fine.
11        THE COURT: At this stage, do I have to find it
12  is the single most reasonable inference?
13        MR. MARTON: I don't think you do at this stage.
14  I think ultimately that's whether or not we prevail on the
15  claim.
16        THE COURT: Is there anything else you want to add?
17        MR. MARTON: Nothing else.
18        THE COURT: Okay. Mr. Rovner.
19        MR. ROVNER: Your Honor, I'll be addressing the
20  claims 1 through 11, and Mr. Choa will address the motion to
21  amend.
22        THE COURT: Okay.
23        MR. ROVNER: The situation here is something
24  that I think is sort of we're crossing in the night here.
25  What I've understood until I think a few minutes ago what

13

1   the defendants were concerned about was something that
2   these claims 1 through 11 would somehow be kept alive and
3   they would face them another day. I mean by citing the
4   *Super Sack* line of cases. That is clearly what they had in
5   mind: If there was some sort of concern that jurisdiction
6   wasn't divested from here and that was there some sort of
7   jurisdiction, continuing jurisdiction over their counterclaims
8   or, in *Super Sack,* like a DJ count.
9         The situation in those line of cases is totally
10  different. Those dealt with patents. Did a defendant feel
11  that there was a threat that a patent would be asserted
12  against them, and, therefore, wondering whether there was
13  sort of a finality there or whether they needed to keep
14  their invalidity counterclaim or DJ count alive. That is
15  the line of cases they were talking about in their briefing.
16        The problem here that is we've got claims, and
17  the distinction that was made today is somehow there is a
18  difference between a claim that was once asserted and a
19  claim that was never asserted. And I think the confusion
20  here is we're talking about causes of action, a patent cause
21  of action alleging infringement of a patent versus claims of
22  a patent.
23        We don't want a situation where your Honor
24  dismisses -- Let me put it this way. We have a cause of
25  action for infringement of the patent in suit. That is a

14

1 viable cause of action because we have claims that are going
2 forward. By eliminating a number of those claims, here. 1
3 through 11, there is a danger of you are dismissing part of
4 our cause of action. It doesn't seem proper, and I have
5 never seen a case that differentiated between an unasserted
6 claim and a claim that was asserted and dropped.
7 　　　　　Your Honor, in your two years, have had many,
8 many patent cases. I don't know if you have ever come
9 across a situation where you have got a patentee/plaintiff
10 files a claim for patent infringement and the patent at
11 issue has 20 claims, and they assert claims 1 through 18.
12 　　　　　No defendant that I have ever seen or if I am a
13 defendant, I never say, your Honor, point of parliamentary
14 procedure here. We want you to dismiss claims 19 and 20
15 because they were not asserted. That doesn't ever happen.
16 　　　　　Here, there were claims asserted and those
17 claims had been dropped, and whether you want or they want
18 some sort of agreement we won't pursue them, we don't think
19 it is necessary. They're done. Our chance to bring these
20 claims, claims 1 through 11, in this case, we had the
21 opportunity. It is gone now. We have walked away. They
22 never face these claims again. And the cases cited in our
23 brief are right on point.
24 　　　　　THE COURT: You will never face them again, here
25 and anywhere?

15

1 　　　　　MR. ROVNER: Ever. This was our chance. We
2 brought the '428 patent. We claimed infringement of the
3 '428. This is our shot. We're now limited to claims 12
4 through 18. I don't know what else they want.
5 　　　　　The reason we did not want to stipulate, once we
6 thought it through, stipulation of dismissal is because you
7 dismiss causes of action. You don't dismiss elements of a
8 claim.
9 　　　　　We were discussing it the other day. And one of
10 the examples is let's just say you have a breach of contract
11 claim, and you allege you didn't provide me with the number
12 of widgets that you promised, and that even if you did, your
13 widgets were not conforming, they were below standard. And
14 it turns out that it is proven that the number of widgets
15 was correct. So we still have the claim that the widgets
16 were bad.
17 　　　　　You don't dismiss that sentence of the cause of
18 action. You don't dismiss a portion of the cause of action.
19 You may not be able to prove it but you walk away. It is
20 not a dismissal with prejudice. But they've got Cooper's
21 word -- it is not word but we're done. We can't bring this
22 case in any other court anywhere.
23 　　　　　We're just concerned that we don't want a
24 stipulation of dismissal that you sign saying somehow part
25 of this '428 patent is dismissed. It is not form over

16

1 substance but you can't dismiss.
2 　　　　　THE COURT: Well, as I understand it, your only
3 concern is to make sure claims 12 through, whatever it is,
4 18 are still here, and that you can still proceed on them.
5 Correct?
6 　　　　　MR. ROVNER: That is correct.
7 　　　　　THE COURT: So why can't you all work out a
8 stipulation of dismissal that makes very clear that 12
9 through 18 are forever still yours?
10 　　　　　MR. ROVNER: Because, again, this is a -- we
11 will sign a covenant not to sue. We will do whatever the
12 mechanism that gives them assurances that they don't have
13 to ever worry about the '428 patent, I mean ever again. And
14 that is just because we don't believe you have to do that
15 because there are so many -- you know, it is res judicata.
16 It is law of the case.
17 　　　　　THE COURT: But those things do require
18 potentially, you guys want it, requires them to take some
19 steps to enforce that. You could turn around and sue them
20 again in the future and make them file a motion to dismiss
21 based on res judicata.
22 　　　　　MR. ROVNER: We could do that even if there was
23 a stipulation of dismissal. I mean it would be sort of
24 silly, just like it would be silly to assert claims that
25 we dropped. And in open court, I am telling you we are

17

1 dropping those claims, but we don't think the procedural
2 mechanism is a dismissal, because it is not a dismissal of
3 a cause of action. It is a dismissal of some claims of a
4 patent that is going forward.
5 　　　　　THE COURT: So why did Mr. Andre send a
6 stipulation in the first place?
7 　　　　　MR. ROVNER: Well, I believe what happened is,
8 what his view was -- and this is something that he regrets
9 now -- but by saying with prejudice, what he meant was we're
10 never going to bother you again.
11 　　　　　When it was pointed out to him by his trusted
12 counsel that that was inappropriate, we realized that we'll
13 give them every assurance that they want but having it
14 dismissed, part of the patent claims dismissed is inappropriate.
15 That's all. But we're done with everything but claims 12
16 through 18.
17 　　　　　THE COURT: All right. Is there anything else
18 you want to say?
19 　　　　　MR. ROVNER: No. That's all, your Honor.
20 　　　　　THE COURT: All right. Let me hear from Mr. Choa.
21 　　　　　MR. CHOA: Good afternoon, your Honor.
22 　　　　　THE COURT: Good afternoon.
23 　　　　　MR. CHOA: Prejudice is no doubt one of the
24 grounds on which Cooper has opposed the motion to amend.
25 There are also additional grounds, which include undue

18

1 delay, bad faith, as your Honor touched upon earlier,
2 futility of amendment. And because of that, and because
3 Twitter has moved to amend after the time provided for in
4 the scheduling order, they must show that there is good
5 cause for the motion.
6     On the undue delay point, Everbridge filed its
7 claim for inequitable conduct on January 22, 2010. Federal
8 Signal filed its counterclaim for inequitable conduct on
9 February 26th, 2010.
10     Twitter did not. Twitter waited until
11 September 9th, 2011, over a year later, to seek leave to
12 amend to add its claim of inequitable conduct. It also
13 waited until over ten months after the time provided for
14 doing so in the scheduling order.
15     At the very least, upon seeing their codefendants
16 claims for inequitable conduct, Twitter was put on notice
17 there was a potential issue of inequitable conduct in this
18 case, and they were obligated to conduct discovery in an
19 expeditious manner which would have allowed them to seek
20 leave to amend their answer and counterclaims within the
21 appropriate time period.
22     In this *Pressure Products Medical Supplies* case
23 that was cited in Cooper's answering brief, the Federal
24 Circuit held that: The issue of inequitable conduct was
25 evident from the declarations that the inventors had filed

19

1 with the PTO. The Federal Circuit, in denying leave to
2 amend for inequitable -- to add a claim of inequitable
3 conduct said once you got the file wrapper, you were aware
4 of these declarations. You should have gone out and
5 conducted discovery in a timely manner so you could have
6 pled these claims appropriately.
7     In addition, there is also the bad faith ground.
8 Twitter waited until the eve of the close of fact discovery to
9 seek leave to amend. There are really only two explanations
10 for this. Either it didn't believe its codefendants had a
11 Rule 11 basis to make their claims and their answers and
12 defenses or it waited to prejudice Cooper.
13     Twitter's excuse that it was relying on fact
14 discovery before bringing its claims is belied by its own
15 papers. When they filed their opening brief and their
16 motion, there had been no inventor depositions yet -- the
17 inventor depositions, two of which I believe took place
18 before the reply brief was filed but not until after the
19 motion and the opening brief. If they were truly waiting
20 for discovery, they would have waited until they had deposed
21 the inventors or at least prosecution counsel so they could
22 have added these details both to their amendments and their
23 motion papers.
24     They also touched upon the prejudice angle.
25 And Twitter claims there is no prejudice to Cooper because

20

1 Federal Signal and Everbridge already have inequitable
2 conduct claims in their case. They actually pointed out
3 the very prejudice to Cooper is that if Federal Signal and
4 Everbridge do not go forward in this case and do not go to
5 trial, there is no inequitable conduct claim.
6     In essence, Twitter, by waiting for so long to
7 amend, they tendered this defense to their codefendants.
8 And if we go forward to trial and the codefendants are there
9 and there is a finding of inequitable conduct, then Twitter
10 will benefit. And if they somehow do not go to trial and
11 Twitter is not allowed to bring its inequitable conduct
12 case, well, that is prejudice to Twitter but it is of their
13 own making.
14     THE COURT: And the alternative is a cognizable
15 prejudice that the Court should be concerned with? That if
16 you can reach a deal with the other two defendants on a
17 defense that is fully prepared that you have known about
18 since pretty much the beginning of the case, that you have a
19 right to get rid of it?
20     MR. CHOA: I think it goes to playing within the
21 rules of the game. The scheduling order set forth the time
22 to amend. Cooper had a right to know what claims it would
23 be facing at trial and from which defendants.
24     As you can see from the summary judgment briefs,
25 the defendants have not spoke formally with one voice, and

21

1 to say at this point Twitter should be allowed to lob these
2 claims in at the very end just to protect itself should its
3 codefendants drop out of trial, well, the time for that has
4 passed, your Honor. The prejudice comes from the fact, the
5 very fact they could be facing an inequitable conduct claim
6 but they should not be normally facing that had Twitter
7 followed the rules.
8     In terms of preparing the defense and knowing
9 about it all along, even in Twitter's amendments, they don't
10 name a specific individual. That is kind of the touchtone
11 of inequitable conduct. You can't lob these claims against
12 a generic body, against a person. The cases all say a
13 specific individual. And if you look at Twitter's
14 amendments, if you look at their briefs, they say one or
15 more inventors. They don't name the person who knew of the
16 alleged material information. They don't name the person
17 who had the intent to deceive the PTO. There is no
18 specificity that is required. And,
19     That goes to the final point, which is the
20 futility and the intent to deceive. And as your Honor
21 asked, do they at this point have to show that the single
22 most reasonable inference is intent to deceive? And they
23 do. And that is what the Federal Circuit held. Under Rule
24 9(b), the pleading stage, you have to look at all of the
25 facts alleged and determine if the single most reasonable

22

1  inference is that they intended to mislead the PTO. And if
2  you look at the allegations and the amendments and you look
3  at Twitter's papers, that is simply not there. The argument
4  has always been, and it continues to be this day and is in
5  the summary judgment briefing, is that the alleged REACT and
6  RoaMail do not embody the claims of the '428 patent. And,
7  therefore, they would not material information that they
8  were required to disclose to the PTO.
9        In addition, its allegation of intent is so
10 broad, it doesn't even -- even if they didn't have to allege
11 a single most reasonable inference this time, they haven't
12 alleged really any inference. All they say is a reasonable
13 inference is that the omission of the public use or the
14 offer to sell the REACT system and a RoaMail system was
15 intentionally designed to mislead or deceive the U.S. Patent
16 and Trademark Office.
17       That is boilerplate language, your Honor. There
18 is no facts to back it up. There is no specific allegation
19 to back it up. And if they had the depositions that they
20 claim of the inventors, well, that should have been in their
21 papers and that should have been in their amendment.
22       In addition to failing to allege the intent
23 point, I don't want to belabor it because it is briefed
24 heavily in the summary judgments papers, but there is no
25 evidence that RoaMail and REACT embodied the '428 patent.

23

1  The deposition of Mr. Freudberg. He had no access to source
2  code. He didn't -- he wasn't a technical guy. He doesn't
3  know what he was seeing compared to what was in the '428
4  patent. He testified he had no access to source code and he
5  could not identify what software modules were present at any
6  given point in time.
7        Twitter also relies on the source code but the
8  source code they relied upon postdates the priority date of
9  the '428 patent, so whatever is in that source code is not
10 evidence as to what existed prior to the critical date.
11       Finally, there was one document relied upon by
12 Twitter which was an e-mail but it actually shows that the
13 RoaMail service was meant to be an e-mail forwarding service,
14 not the mass notification system that is present in the '428
15 patent.
16       So, your Honor, while we believe there is only
17 one basis necessary for you to find to deny their amendment,
18 whether it is undue delay, whether it is bad faith, whether
19 it is prejudice, or whether it is futility, we think all
20 four are present.
21       As Twitter has acknowledged in the paper,
22 inequitable conduct is the atomic bomb of patent litigation
23 and its use in this case should be guardedly restricted as
24 such because it is a very damaging allegation.
25       THE COURT: In your brief, you suggest there is

24

1  some discovery you might still want on inequitable conduct.
2  I recognize you wrote that brief some months ago. Is there
3  still something that you would seek if I grant relief?
4        MR. CHOA: I would have to review that, your
5  Honor. I think we certainly would want to know what
6  individual they're accusing. One or more inventors doesn't
7  cut it, you need the name, and that is certainly something
8  we would seek to get.
9        THE COURT: Do you agree with Mr. Marton that
10 the allegations that Twitter seeks to add to the case are
11 exactly same that are already in the case by their
12 codefendants?
13       MR. CHOA: I will preface the representation,
14 the pleadings are different. They are not word for word
15 identical.
16       THE COURT: Is it true they put in a combined
17 expert report on this?
18       MR. CHOA: I believe that is true, your Honor.
19 But it also goes to the identity. Without the naming of the
20 inventor, I don't know if Twitter has the same person as
21 Everbridge and Federal Signal do. I don't know if they intend
22 to accuse the prosecuting attorney or just the inventor.
23 That's part of the problem with their amendment.
24       THE COURT: But you have seen their expert
25 report at this point.

25

1        MR. CHOA: That is correct, Your Honor.
2        THE COURT: Is there anything else?
3        MR. CHOA: That's all.
4        THE COURT: All right. Mr. Marton.
5        MR. MARTON: Thank you, your Honor. I'll be
6  brief and address just the points that I think are most
7  critical.
8        Starting with the motion to dismiss. Cooper's
9  counsel has represented that its primary concern is that
10 dismissals are about causes of action, not claims, like
11 particular claims within a patent.
12       It is common in patent litigation that there be
13 summary judgments of noninfringement or summary judgment
14 dismissals of patent claims, specific to claims. We have
15 all seen them. Claims 1 through 11 could be dismissed per
16 summary judgment and claims 12 through 18 could survive, and
17 it would be very, very clear, and there would be no harm or
18 damage whatsoever to Cooper if we did this. That may be a
19 solution that we could follow here.
20       THE COURT: What about the offer of a covenant
21 not to sue? Would that satisfy the defendants?
22       MR. MARTON: If there was a covenant not to sue
23 that was filed before this Court that said we're not asserting
24 these claims and we never will, that would be fine. I just
25 want something on the record before the Court.

26

1  THE COURT: And Mr. Rovner's repeated statements
2  here in open court are not enough.
3  MR. MARTON: They come very, very close. I just
4  have some hesitation because I honestly don't understand why
5  we cannot enter the stipulation that was first agreed upon,
6  why there can't be an acknowledgment on the record by Cooper
7  that there is a dismissal with prejudice. It doesn't make
8  sense to me.
9  THE COURT: Well, at this point, I heard
10 everything you have heard. What is defendant's request? Do
11 you want time to talk, see if you can work out a covenant
12 not to sue or do you want me to rule on the motion?
13 MR. MARTON: I'd like you to rule on the motion.
14 I want a dismissal with prejudice. I see no downside, and
15 it can specifically say claims 12 through 18 are still in
16 the case. The Court can enter the stipulation that was
17 proposed by plaintiff before I made my nonsubstantive edits
18 to it. That would be fine.
19 THE COURT: Go on.
20 MR. MARTON: So that is all I have to say about
21 the motion to dismiss.
22 On the motion for leave to amend, I'll start with
23 prejudice. It sounds like Cooper's notion of prejudice here
24 is based on some kind of equitable principle that because
25 Twitter, according to Cooper, tendered the inequitable conduct

27

1  defense to its codefendants, it should not be allowed to
2  benefit from it, should the codefendants be dismissed from
3  the case.
4  Beside from the fact that that is not a legally
5  sound argument, it is just not based on an adequate factual
6  predicate. Twitter did not tender this defense to its
7  codefendants. Twitter worked this defense up and waited until
8  it was very comfortable with it to plead it. And there is no
9  harm or prejudice whatsoever to Cooper if Twitter is allowed
10 to proceed.
11 With respect to the futility arguments about that
12 there is no on-sale bar or public use of these products, it is
13 thoroughly briefed in our summary judgment motions. There is
14 an abundance of evidence that both products were on sale, in
15 use and are commercial embodiments of the patent and to argue
16 that this is somehow futile is a strained position to take.
17 This is quintessential inequitable conduct. This
18 reaches back to *Keystone Driller*. This is what started the
19 concept of inequitable conduct. It is this concerted and
20 planned deception of the PTO based on some misstep taken before
21 the filing of the patent. It was done by the inventors and
22 their prosecuting counsel. We submit that we didn't specific-
23 ally name each inventor but we are asserting that each
24 inventor was involved in this deception.
25 That's all I have.

28

1  THE COURT: Okay. Thank you.
2  We'll take a short recess. When I come back,
3  I'll give you some rulings, and I also just want to hear if
4  you all have any status update in light of the fact that we
5  did get the claim construction out and what, if anything,
6  you have to say about whether that has any impact at all on
7  any of the motions that are currently in front of the Court.
8  So I'll be back in a few minutes and we'll discuss that.
9  (Brief recess taken.)
10 THE COURT: Have a seat.
11 I am prepared to give you my ruling on the two
12 motions that were argued today, and I'll do so in the order
13 that you argued them.
14 So, first, we have the defendant's motion to
15 dismiss with respect to claims 1 through 11 of the '428
16 patent.
17 That motion is granted. As is clear, the
18 plaintiffs were, throughout this case, asserting infringement
19 of claims 1 through 11. They did so at least including
20 through the time of serving infringement contentions.
21 The plaintiffs, it is also clear, are no
22 longer asserting infringement of claims 1 through 11. The
23 plaintiffs proposed a stipulation indicating that they were
24 withdrawing those claims and that such withdrawal should be
25 with prejudice but then inexplicably the plaintiffs refused

29

1  to execute and file that stipulation.
2  The defendants are, in the Court's view,
3  entitled to as most certainty as we can give them that they
4  will never be confronted again with claims 1 through 11 of
5  the '428 patent, and the best we can do is a court order
6  to that effect, and that is what I am providing to the
7  defendants.
8  Therefore, the Court does hereby order that
9  defendant's motion to dismiss is granted with respect to
10 claims 1 through 11 of the '428 patent. The remaining
11 asserted claims of the '428 patent are not affected by the
12 Court's order.
13 Under the circumstances, I do want to enter a
14 written order consistent with what I have just orally
15 ordered, so I am directing that the defendants, by the end
16 of the day Monday, submit a proposed form of order which
17 will be agreed to by the plaintiff.
18 If, by chance, there is some disagreement with
19 the form of the order, then you will have to submit to me
20 your competing proposals and I'll resolve it at that point.
21 That is my ruling on the motion to dismiss.
22 Next is Twitter's motion for leave to file
23 its first amended answer to add the affirmative defense of
24 inequitable conduct and the related defense of unclean
25 hands and the related counterclaim of unenforceability.

30

1  This motion is granted. The motion is governed
2  by Rule 15 which provides, of course, a liberal standard
3  favoring amendment and directs that leave to amend should be
4  freely granted when justice so requires.
5      Here, while certainly other approaches to the
6  approach that Twitter took may also be appropriate, it
7  was not unreasonable here for Twitter to proceed as it did
8  in that it accumulated evidence it believe supported an
9  inequitable conduct counterclaim before seeking leave to
10 amend its pleadings to add that. The evidence that it
11 accumulated includes the deposition of Mr. Freudberg and
12 also materials that the Court ordered Cooper to produce in
13 connection with certain discovery disputes.
14     Twitter is not unduly delayed under the
15 circumstances. Cooper is not unduly prejudiced by the
16 leave requested. The amendment is not futile, although the
17 merits of the inequitable conduct and related claims will
18 be addressed in more detail in connection with the pending
19 motions for summary judgment and/or at or after trial.
20     In addition, there is no evidence that the
21 Court sees of Twitter's bad faith. Twitter's approach was
22 particularly reasonable here given that they seek leave to
23 plead essentially an identical claim to what is already in
24 the case due to their codefendants' pleadings. Moreover,
25 granting the relief requested by Twitter does not affect any

31

1  other dates in the schedule. Moreover, under these
2  circumstances, the Court finds, to the extent it needs to,
3  good cause to amend the scheduling order to permit the
4  amended pleading.
5      So the requested leave is granted and Twitter is
6  directed to file its amended pleading by next Monday.
7      I also have made a determination on the
8  sanctions request which was a matter that was outstanding
9  from some time ago. That is, I had ruled that sanctions
10 would be awarded in connection with a deposition but had
11 not indicated or had not determined how much the sanctions
12 would be, and you all submitted some additional submissions
13 in compliance with the court order.
14     Having reviewed those submissions, I can now
15 give you and hereby do rule on the request for sanctions.
16     Federal Signal requested sanctions of $20,566.98,
17 Plus an additional $1,591. The entirety of Federal Signal's
18 request is granted.
19     Everbridge had also requested sanctions I believe
20 of approximately $20,000. The entirety of Everbridge's
21 request for sanctions is denied.
22     Let me explain how I reached these conclusions.
23     First, as a general matter, the Court ruling is
24 submitted by Federal Rule of Civil Procedure 37(d). As the
25 Court found on a teleconference on December 15th, 2011,

32

1  Cooper committed sanctionable conduct by producing a Rule
2  30(b)(6) witness who was unprepared on certain topics.
3      Cooper's sanctionable conduct necessitated a
4  second deposition which under the circumstances required
5  Federal Signal to use a different attorney, albeit one who
6  billed at a lower rate than the one who took the first
7  deposition, but to use a different attorney who had to take
8  a trip to New York and had to prepare for and take that
9  second deposition, and then Federal Signal had to again pay
10 for a videographer and the transcript.
11     The Court has reviewed the billing documentation
12 submitted by Federal Signal as well as the other material,
13 and rejects each and every argument made by Cooper against
14 Federal Signal's request for the recovery of the money that
15 I have ordered.
16     The Court did not intend by any of its
17 statements on the teleconference on December 15th to rule
18 out the possibility of awarding attorney fees to Federal
19 Signal as part of the sanction it was imposing. Federal
20 Signal did in fact incur additional attorney fees as a
21 direct result of the earlier designated witness being
22 unprepared to testify and Federal Signal deserves to be
23 reimbursed for those attorney fee expenditures.
24     It is appropriate under the circumstances to
25 reimburse Federal Signal for costs, including attorney

33

1  fees associated with the preparation of its sanctions motion
2  and its supporting documentation as none of that effort
3  would have been necessary had Cooper either nonengaged in
4  sanctionable conduct in the first instance or, having
5  engaged in it, agreed, when Federal Signal requested it,
6  to pay the costs and fees that Federal Signal incurred in
7  connection with the second deposition.
8      Turning briefly to Everbridge's request for
9  sanctions, which I have denied, the Court agrees with
10 Everbridge that it too suffered, just like Federal Signal,
11 from Cooper's sanctionable conduct and agreed that an award
12 like that sought by Everbridge could be appropriate. And
13 it is true also that during the December 15th teleconference
14 the Court was contemplating that perhaps all defendants who
15 had counsel present at the second deposition, it is the
16 deposition of Mr. Lowry, it was possible, I was considering
17 that all defendants who had counsel at that deposition might
18 need to be reimbursed.
19     However, Everbridge did not move for such relief
20 at an appropriate time which would have been in connection
21 with Federal Signal's motion or certainly no later than
22 during the December 15th teleconference. Therefore, Cooper
23 was not on notice that it was defending against a sanctions
24 request from anyone other than Federal Signal.
25     Federal Signal's letter, I am referring to DI

34

1  355, was ambiguous, at times stating that Federal Signal
2  seeks sanctions and at other times more broadly referencing
3  defendants, and nothing during the teleconference indicated
4  that Federal Signal's counsel that day was speaking on behalf
5  of all defendants, and the ambiguity here cuts against award-
6  ing sanctions to Everbridge, given that Cooper was not
7  properly on notice that it was defending against a sanctions
8  request from Everbridge as well as Federal Signal. Accordingly,
9  on reflection, it would be improper to award Everbridge
10  sanctions.
11         So that is the Court' ruling on sanctions.
12         I do want to see if any of you have any update
13  for us on the status of the case in light of the Markman
14  ruling and whether we're on track for trial in July and
15  anything else you think requires the Court's attention.
16         Mr. Rovner.
17         MR. ROVNER:  Your Honor, we have looked at, we
18  reviewed your Honor's opinion.  We are considering several
19  options.  One may be that we might seek leave for brief
20  surreply because the briefing on the noninfringement motions
21  we believe would be impacted by what is your Honor's ruling.
22  So we're in the process of doing that, and we would like
23  perhaps a few more days to be able to tell you exactly where
24  we seek leave.  It would be limited to the noninfringement
25  motions.

35

1         I would volunteer to work with defense counsel
2  to see if they would agree.  They may also want leave to
3  file surreplies.  I am not sure.  Your decision obviously
4  impacts the infringement versus noninfringement briefing by
5  both sides.
6         THE COURT:  Okay.  Is there anything else in the
7  way of status that you think we should address at this time?
8         MR. ROVNER:  Not at this time, your Honor.  Is
9  it possible to get a date certain when we can alert you to
10  what our next move is?
11         THE COURT:  Yes.  I am going to first see what
12  defendants have to say, but I will do that.
13         Mr. Marton.
14         MR. MARTON:  I think we're on track for the
15  summary judgment hearing and trial.
16         Your claim construction ruling came out before
17  our reply briefs were due and our arguments in our opening
18  briefs were consistent with your opinions anyway and we
19  affirmed that in our reply.  So at least as of now, we don't
20  need additional briefing.
21         If plaintiffs need a surreply, we can consider
22  their reasons for it, and we probably agree that it is okay
23  if we can then respond to their arguments, if needed.  And
24  that's about it.
25         We do have a question, defendants do, for

36

1  planning purposes.  How much time do you think we might have
2  on March 9th for the summary judgment and Daubert motions?
3         THE COURT:  Do you have a request for a
4  particular amount of time?
5         MR. MARTON:  I haven't conferred with my
6  co-counsel on it.
7         THE COURT:  All right.
8         MR. MARTON:  I think a fair amount of time will
9  be needed.  There are a lot of issues.
10         THE COURT:  I will address it in a moment.
11         Is there anything else from defendants?
12         MR. COTTRELL:  No, your Honor.
13         MR. HIGGINS:  No, your Honor.
14         THE COURT:  Okay.
15         MR. ROVNER:  Your Honor, if you don't mind,
16  there was a good point.  While their reply briefs on their
17  noninfringement motions, their reply briefs did postdate the
18  claim construction ruling, our opposition brief to the
19  noninfringement positions predated.  That's why we're
20  seeking and I think would be limited to opposing their
21  motions for noninfringement.
22         THE COURT:  Right.  I appreciate you raising all
23  of those points.
24         I would like to hear back from the parties and
25  hereby order that you get back to me by the end of the day

37

1  Monday.  At that time, let's have you put this in a joint
2  letter, tell me whether you have reached agreement on any
3  additional briefing.
4         I can tell you as guidance it seems to me
5  appropriate that there would be some surreply briefing in
6  light of the fact that the claim construction order came
7  out and the plaintiffs have not had a chance to address it
8  and whatever impact it may have on the motions.  I won't
9  quite make that a ruling but that is my guidance.  So see
10  if you can work out what to do in terms of timing and what
11  additional briefing might need to be filed.  And also meet
12  and confer as to how much time you all think you might need
13  at any upcoming hearing to argue these motions.
14         Once I have that, I will get back to you on
15  those matters.
16         Is there anything further, Mr. Rovner?
17         MR. ROVNER:  One final thing, and I am not even
18  sure that we need this, but with the motion to amend being
19  granted, you mentioned further discovery we would need.  I
20  am not sure we will need any, but we may, so we would like
21  the opportunity to conduct that discovery, if need be.
22         THE COURT:  My ruling today doesn't go to
23  whether or not there will be any additional discovery, so
24  you will see.  If you think you need some and you don't get
25  it, then you will be back to me with respect to a discovery

```
                                                              38
03:02:55  1   dispute.
03:02:55  2              MR. ROVNER:  Thank you, your Honor.
03:02:56  3              THE COURT:  Is there anything else from
03:02:57  4   defendants?
03:02:58  5              MR. MARTON:  Can I make one statement about the
03:03:00  6   additional discovery?
03:03:01  7              THE COURT:  Sure.
03:03:01  8              MR. MARTON:  Plaintiffs have had notice of our
03:03:05  9   intent to amend the pleading.  In fact, we gave them an
03:03:09 10   amended pleading on August 11th, 2011, which was more than
03:03:12 11   two months before the close of discovery.  They never served
03:03:14 12   any discovery related to those additional allegations, and
03:03:18 13   we don't think they should be entitled to serve any more at
03:03:21 14   this point anyway.  That's all.
03:03:24 15              THE COURT:  That has been noted.
03:03:25 16              Is there anything else from defendants?
03:03:26 17              Okay.  Thanks.  We'll be in recess.
03:03:40 18              (Hearing ends at 3:03 p.m.)
         19
         20         I hereby certify the foregoing is a true and accurate
              transcript from my stenographic notes in the proceeding.
         21
         22                         /s/ Brian P. Gaffigan
                                   Official Court Reporter
         23                          U.S. District Court
         24
         25
```